IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES for the use of
QUALITY TRUST, INC.,

                    Plaintiff,

        Vs.                                          No. 04-4157-SAC

CAJUN CONTRACTORS, INC.,
d/b/a CAJUN CONSTRUCTORS,
INC., and LIBERTY MUTUAL
INSURANCE COMPANY,

                    Defendants.

MEMORANDUM AND ORDER

        The case comes before the court on the motion for summary

judgment (Dk. 79) filed by Cajun Contractors, Inc. ("Cajun") and Liberty

Mutual Insurance Company (collectively "defendants") asking for judgment

as a matter of law in favor of the defendants on the plaintiff's claims and in

favor of Cajun on its counterclaim against the plaintiff.  Also pending before

the court is the motion for summary judgment (Dk. 85) filed by the plaintiff

Quality Trust, Inc. ("QTI") asking for judgment as a matter of law in its favor

on its breach of contract claim against Cajun.  The motions are ripe for

decision.

**SUMMARY OF CLAIMS**

Cajun entered a general contract with the United States Army Corps of Engineers ("COE") for the construction of a wastewater facility at Fort Riley, Kansas.  The project entailed the partial demolition of the existing facility and the construction of the new facility.  Cajun subcontracted with QTI to erect eight metal buildings as part of the new facility.  Under the subcontract, Cajun was to construct the concrete building pads, to procure the buildings through a third party supplier, and to provide the buildings for QTI to erect and finish.  When Cajun terminated the subcontract on June 26, 2004, QTI had partially erected four of the metal buildings.

The plaintiff QTI complains that Cajun unreasonably delayed in providing the concrete pads and metal buildings, demanded that QTI erect the buildings within an unreasonably short period of time and manner, wrongfully terminated the contract for cause, and refused to pay the plaintiff accordingly.  Cajun defends that it released work on the different buildings to QTI consistent with the COE's selected Critical Path Method ("CPM") schedule as was agreed to in the subcontract.  Cajun alleges that QTI's work did not meet CPM schedules, that QTI did not correct the concerns

2

raised in Cajun's correspondence, that QTI failed to provide proper

submittals and to procure needed materials, and that QTI's workmanship,

manpower and submittals, insurance and safety compliance were inferior

to the Project's requirements.  Cajun says it terminated the subcontract for

cause due to OTI's failure to complete its work in a timely and qualified

manner.  Following the termination, Cajun hired other subcontractors who

completed QTI's remaining work at increased prices.

**SUMMARY JUDGMENT STANDARDS**

A court grants a motion for summary judgment under Rule 56 of

the Federal Rules of Civil Procedure if a genuine issue of material fact

does not exist and if the movant is entitled to judgment as a matter of law.

The court is to determine "whether there is the need for a trial-whether, in

other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved

in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

(1986).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will . . . preclude summary judgment."  *Id.*  There

are no genuine issues for trial if the record taken as a whole would not

persuade a rational trier of fact to find for the nonmoving party.  *Matsushita*

3

*Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In applying this standard, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]."  *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) (internal quotation marks omitted). "Credibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge."  *Id.* at 1216 (internal quotation marks omitted). Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.'"  *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law."  *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992).  If this burden is met, the nonmovant must "set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). (citations omitted).  "To

4

accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Id.*  A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment.  *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).  Only admissible evidence may be reviewed and considered in a summary judgment proceeding.  *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995).  The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The summary judgment inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed. R. Civ. P. 1."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

**STATEMENT OF UNCONTROVERTED FACTS**

Through stipulations appearing in the pretrial order, the parties have agreed on some of the factual background.  The court's statement incorporates those stipulations as well as the facts found to be uncontroverted from reviewing the briefs and attachments submitted in support of both summary judgment motions.  The court reserves discussion of the controverted facts under its analysis of the summary judgment arguments.

In September of 2002, Cajun was awarded a general contractor agreement with the COE that called for the construction of a wastewater facility at Fort Riley, Kansas.  On March 11, 2003, Cajun entered into a subcontract with QTI for the construction and erection of eight metal buildings.  Under the subcontract, Cajun was to construct the concrete building pads and to furnish the metal buildings, and QTI was to erect the metal buildings.

*Representations Concerning Timing of Work*

For the purpose of preparing its bid that eventually was accepted, the president and CEO of QTI, Larry Ruiz, estimated taking between 12 and 15 months to complete its onsite performance of the work.

6

Contract negotiations including conversations over the dates for starting and completing the work.  Ruiz, however, did not negotiate for the subcontract to include any specific dates or times for the commencement and completion of its work.  After he signed the subcontract,[1] Ruiz reviewed the COE's latest schedule or CPM and understood that QTI's work was scheduled to begin in the middle of 2003 but that the construction project was currently behind schedule.

*Terms of Subcontract on Timing of Work*

The subcontract includes the following relevant terms on the subcontractor's time for performance:

**ARTICLE 2-SCOPE OF WORK**
Subcontractor shall perform and furnish all labor, supervision, services, . . . necessary to perform and complete the work identified and described or which can be reasonably inferred from Schedule A attached hereto ("The Work"), being a portion of the work required of Contractor under the Contract between Owner and Contractor.  The Work shall be performed by Subcontractor in a good and workmanlike manner, strictly in accordance with the Contract Documents, consisting of the Contract and the plans, specifications,

---

[1] In his affidavit, Ruiz declares that, "[a]t the time of the subcontract," he "reviewed the construction schedule dated February 24, 2003, which called for work erecting the metal buildings to begin at or before mid-2003, and showed approximately one year was available to perform that work." (Dk. 87, ¶ 7).  In his deposition, Ruiz was more definite as to when he reviewed the schedule.  He testified that he did not review the CPM until "shortly after" signing the subcontract and learned then the construction was behind schedule.  (Dk. 95, Ex. 2, pp. 98-99).

addenda and other documents and all subsequently and duly issued modifications thereto.

## ARTICLE 3-PERFORMANCE OF THE WORK

A.   **Work Commencement**.  No work by Subcontractor  shall begin until the following are met: . . . and (4) Contractor notifies Subcontractor that work is ready to begin.

B.   **Plans and Specifications**.  Subcontractor shall be bound to Contractor by the terms and conditions of the Contract Documents, as the same shall be applicable to the Work and the Subcontract and the Subcontractor assumes all obligations and responsibilities and duties that the Contractor has by the Contract Documents assumed toward the Owner.

. . . .

C.   **Schedule**.  Time is of the essence and the subcontractor agrees to perform his work in time that will allow the entire Project to be completed in accordance with the Project Contract Documents and General Contractor's Schedule of Work.  The General Contractor shall prepare the schedule of work and revise such schedule as the work progresses.

D.   **Facts Known to the Parties**.  The parties agree that, at the time of the execution of this Agreement, the Contractor and Subcontractor are informed of the same facts with regard to the work site covered by the Contract Documents between the Owner and the Contractor and of the difficulties which may be encountered in the performance of the work subcontracted hereunder.  Subcontractor represents and agrees that it has carefully examined and understands the Contract Documents relevant to the Work; has adequately investigated the nature and conditions of the Project site and locality; has familiarized itself with conditions affecting the difficulty of the Work; and has entered into this Subcontract based on its own examination, investigation and evaluation and not in reliance of any opinions or representations of the Contractor.

. . . .

F. **Extensions of time.**  Should Subcontractor, without any fault or neglect on its own part, be delayed in the completion of the Work by the fault or neglect of Contractor or Owner, Subcontractor, as its sole remedy, shall be entitled to a reasonable extension of time only. . . .  In no event shall Subcontractor be entitled to compensation or damages for delay in the commencement, prosecution or completion of the Work for any schedule adjustments resulting therefrom except to the extent that Contractor shall receive such compensation or damages from Owner or a third party.

G. Notwithstanding any provision to the contrary in the contract Documents or this Subcontract, Subcontractor shall not be entitled to an extension of time unless written notice of delay shall have been delivered to Contractor within seventy-two (72) hours after commencement of the claimed delay.

(Dk. 80, Ex. C).  As admitted by Ruiz, the subcontract lacks a time limit and time frame for QTI's performance and does not specify a commencement date for QTI's work.  Ruiz testified that he understood the subcontract did not give OTI any right to begin work until Cajun notified it.

*Release to Work Dates and Schedule Changes*

In October of 2003, QTI was authorized to begin the brick work on the Ferrous Chloride building and was paid for its work.  The metal building manufacturer delivered in January of 2004 other buildings for QTI to install, but Cajun did not release QTI to begin their construction until March and April of 2004.  According to Ruiz, Cajun delayed the release of this work because Cajun was behind in completing the foundations and

slabs for the buildings.

On March 23, 2004, Cajun advised QTI to commence work on the Solids Dewatering building on March 29, 2004.  In April, Cajun also issued QTI notices to proceed on two other buildings.  As of April of 2004, QTI had received notices to work and was proceeding on four buildings: Ferrous Chloride building, Solids Dewatering building, Headworks building, and Administration building.  Ruiz avers that the dates on which Cajun issued these notices and its successive issuance of notices within a short time period are contrary to the dates and periods outlined in the construction schedule in place in February of 2003 when QTI entered the subcontract.

According to the affidavit of Cajun's project manager, Chip Dupuy, the construction schedule was periodically adjusted based on the project's progress as allowed by the subcontract.  Dupuy avers that QTI was notified of the changes and provided the updated schedules.  Dupuy states that the notices to work were timely issued to QTI consistent with the updated project schedules and the terms of the subcontract.

Ruiz opines that Cajun's delayed notices "severely accelerate[d] and compress[ed] the time available for Quality Trust, Inc. to

10

do the erection work." (Dk. 87 ¶ 10). Ruiz and QTI's expert witness, Joe Metzger, offer that QTI could have completed all of its work within the longer time it reasonably expected from the original construction schedule. Ruiz and Metzger also conclude that Cajun's unreasonable delay in authorizing QTI's work made it impracticable for QTI to complete its work according to schedule.

Dupuy denies that the project schedule ever allowed QTI one year to complete its work. Dupuy also avers that QTI did not complain of late start dates, scheduling delays, or other interference with its subcontract work before Cajun issued its notice of default to QTI. Nor did QTI provide Cajun with any written notices of delay or unsuitable work conditions prior to the default notices.

<em>Immediate Issues with QTI's Performance</em>

By letter dated April 15, 2004, Cajun addressed QTI's written report of its progress on the Solids Dewatering building and its plans for the Administration building. Cajun informed QTI that it was dissatisfied with OTI's framing work on the solids dewatering building, with QTI's incomplete work on the submittals, and with QTI's failure to have an adequate insurance certificate on file. The letter disclosed Cajun's concern over

11

whether QTI's work force was qualified to handle the Administration building.  It also pointed out that QTI had not started the steel and roof work on the Ferrous Chloride building.

Dupuy wrote a letter dated April 16, 2004, to confirm a telephone conversation between him and Ruiz on April 15, 2004.  The letter discloses that Ruiz had promised to increase QTI's work force and had opposed Cajun's offer  to provide additional help.  Dupuy asks in the letter for Ruiz to confirm that he had represented the Administration building would be erected in three weeks and the Solids Dewatering building in four weeks.  The letter further cautions:

> The total time frame it will take Quality Trust to erect the Solids Dewatering Building is well beyond our scheduled allotted time in our construction schedule.  We do note that Quality Trust has made very little progress this week on the Solids Dewatering Building.

(Dk. 95, Ex. 1(E)).  The letter notes that Cajun was willing to delay starting work on the Ferrous Chloride building for three weeks and if the work had not started by May 10th then Cajun would complete the building and deduct the construction cost from QTI's contract funds.  The letter puts Cajun "on record" as being "concerned with Quality Trust's ability to complete the scope of its work in a timely manner."  "In addition Quality Trust's (sic) is still obligated for several submittals that are outstanding and

12

long overdue." *Id.* Finally, the letter observes that in light of QTI's refusal to accept help, Cajun did consider the letter to be formal notice of its intent to enforce its right under the subcontract to assist if QTI's progress was unacceptable.

*Notices of Default and Termination*

On May 22, 2004, Cajun provided QTI with a written notice of default that gave QTI forty-eight hours to cure.  The notice explains that Cajun was issuing it as QTI had "failed to supply sufficient labor, materials, equipment, supervision and other required items in order to diligently perform the work." (Dk. 95, Ex. 1(F)).  The notice identifies that QTI had not provided a work force of the size promised, had not completed the Administration building or the Solids Dewatering building within the times promised, had not procured painting items for finishing the Ferrous Chloride building, had not procured the materials or installer for the interior work on the Administration building, had not procured a contract or completed submittals for the casework on the administration building, and had not provided adequate qualified supervision on the work site.  The notice also informs QTI that other subcontractors were waiting to work on the buildings and were threatening delay claims.

13

By letter dated May 27, 2004, Cajun provided another notice of default.  (Dk. 95, Ex. 1(G)).  The letter begins with the observation that QTI had "done very little to remedy the situation" outlined in May 22nd letter. The letter says this is Cajun's final notice and that Cajun will terminate the subcontract unless QTI brings its work up to schedule and resolves all outstanding procurement and submittal issues within the next forty-eight hours.  The notice repeats many of QTI's performance deficiencies described in the May 22nd letter and points out that QTI had "not made any significant progress" on the Solids Dewatering building and that the Administration building did not "appear to be even close to being erected." *Id*.

Ruiz avers that QTI's work during the time period of these notices was delayed by "faulty work performed by Cajun and its other subcontractors."  (Dk. 87, ¶ 14).  Ruiz lists generally problems with concrete pads needing to be replaced due to insufficient rebar, with anchor bolts needing to be reset due to improper location, with roofing bolts needing to be relocated, and with flooding at the Solids Dewatering building that caused a two-week delay.  On behalf of Cajun, Dupuy avers that prior to the notices of default QTI never complained of these problems and

14

never provided written notification of unsuitable work conditions  pursuant to the terms of the subcontract.  Dupuy also states that QTI never provided Cajun with a written notice of delay and never complained of delays until after the notice of default.

Cajun's next notice of default and termination is dated June 5, 2004.  This notice terminates the subcontract on the buildings not yet started but allows QTI to complete its work on the buildings already commenced.  (Dk. 95, Ex. 1(H)).  Cajun there explains that QTI had not made "acceptable progress" to remedy the delays caused to the project and outlines the specific reasons underlying its position.  The notice further warns that "[i]f progress does not improve on the work already started by Quality Trust we will fully terminate the subcontract agreement." *Id.*  QTI sent a letter dated June 5, 2005, that apparently challenges Cajun's partial termination of the subcontract and disputes Cajun's reasons for doing so. Cajun replied with a letter dated June 11, 2004, that addresses QTI's different positions. (Dk. 95, Ex. 1(I)).

Cajun terminated the entire subcontract on June 26, 2004, stating:

> We justify this termination after providing many notices, making numerous pleas, and providing numerous letters and faxes to resolve

15

the lack of progress on the project by Quality Trust, Inc.  Likewise we
have provided similar pleas and faxes to resolve the improper and
untimely EEO documentation such as certified payrolls, certificates of
insurance, and SF 1413–Statement of Acknowledgements.
Lastly the recent problems with buildings erected by Quality Trust
and the rework that will be required impacts the project even further.
The fact that Quality Trust has not accepted responsibility for these
errors and has advised CAJUN's Superintendents it is our fault is
even more disturbing.

(Dk. 95, Ex. 1(J)).  Ruiz avers that when the subcontract was terminated,

QTI had completed 100% its work on the Ferrous Chloride building, 75% of

its work on the Headworks building, 65% of its work on the Administration

building, and 50% of its work on the Solids Dewatering building.  According

to Dupuy, QTI had completed less work on each building than represented

by the respective percentages offered by Ruiz.

The above statement of facts provides most of the evidentiary

background and detail required for the key issues and questions discussed

below.  The court will address all other facts in its analysis and holding to

follow.

**ANALYSIS AND HOLDING**

*PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

Unjustified Termination Reverts to Termination for Conveninece

The plaintiff's motion seeks summary judgment only on its

16

breach of contract claim against the defendant.  The plaintiff's first

contention asks the court to find as a matter of law that Cajun had delayed

QTI's performance, that Cajun had insisted on QTI completing the work

within "an unreasonably narrow and congested time frame," and that Cajun

then unjustifiably terminated the subcontract for QTI's failure to meet these

unreasonable time demands.  (Dk. 85, pp. 6-7).   Based on those

requested findings, the plaintiff next asks the court to conclude that certain

Federal Acquisition Regulations ("F.A.R.") were incorporated into the

subcontract and then to apply specifically F.A.R.  52.249-10(c), which

provides:

> If, after termination of the Contractor's right to proceed, it is
> determined that the Contractor was not in default, or that the delay
> was excusable, the rights and obligations of the parties will be same
> as if the termination had been issued for the convenience of the
> Government.

(Dk. 87, Ex. C).  The plaintiff recognizes its recovery for a termination of

convenience is limited by another regulation, F.A.R. 52-249-2(g).  The

plaintiff also relies on another federal regulation, F.A.R. 52-249-10(b), to

argue that Cajun was required to extend QTI's completion deadlines

because Cajun had caused the earlier delays.   Finally, the plaintiff cites

case law from other jurisdictions in support of an implied  covenant of good

17

faith and fair dealing in construction contracts and alleges Cajun's termination was in breach of this covenant.

Cajun defends its termination of the subcontract as not only justified by the plaintiff's deficient performance but necessary to maintain the project's schedule.  The subcontract did not set any specific time periods for the commencement and completion of the work other than in accordance with the "General Contractor's Schedule of Work" which the General Contractor could modify "as the work progresses."  (Dk. 80, Ex. C, Art. 3).  Cajun considers QTI's failure to complete its work in a timely manner as simply due to its apparent incapability to handle a project of this size.  Cajun opposes any use here of F.A.R. 52.249-10 arguing that the subcontract does not incorporate by specific reference this regulation, does not include this regulation among the referenced contract documents, and does not include any language making this federal regulation applicable to the contract.

The court does not find the plaintiff's arguments in its motion to be persuasive in showing that F.A.R. 52.249-10 and the related regulations are operative terms of the subcontract.  Without citation of legal authority or discussion of any particular terms of the subcontract, the plaintiff argues in

18

general terms that the subcontract incorporates these regulations through its incorporation of the "contract documents" that, in turn, refer and incorporate numerous regulations, including the ones at issue.  The plaintiff's motion makes no effort to identify and apply the particular terms of the subcontract arguably allowing for this incorporation of the regulations.  The plaintiff does not cite any legal precedent that would recognize such an incorporation in a contract with similar terms.  Nor does plaintiff offer other arguments or evidence to prove this multi-layered incorporation of an extensive body of federal regulations was what the parties intended by their subcontract.

The plaintiff waits until its response opposing the defendant's summary judgment motion to state and explain its "flow down" theory for incorporating these federal regulations.  The plaintiff looks at articles two and three of the subcontract and construes paragraph B of article three[2] to be a "flow down" clause that makes the federal regulations expressly

---

[2]This provision states:
"B.   **Plans and Specifications.**  Subcontractor shall be bound to Contractor by the terms and conditions of the Contract Documents, as the same shall be applicable to the Work and the Subcontract and the Subcontractor assumes all obligations and responsibilities and duties that the Contractor has by the Contract Documents assumed toward the Owner."
(Dk. 80, Ex. C).

19

incorporated in the contract documents applicable to the subcontract.  The court, however, does not read the plain words of Paragraph B to support such a sweeping flow down of federal regulations.

Flow down "clauses are designed to incorporate into the subcontract those provisions of the general contract relevant to the subcontractor's performance.'" *United Tunneling Enterprises, Inc. v. Havens Const. Co., Inc.*, 35 F. Supp. 2d 789, *794 -795 (D. Kan.,1998) (quoting *Industrial Indemnity Co. v. Wick Construction Co.*, 680 P.2d 1100, 1103 (Alaska 1984)).  "In effect, '[t]he parties to the subcontract thus assume the correlative position of the parties to the prime contract.'" *Id.* (citing A. Dib, *Forms and Agreements for Architects, Engineers and Contractors*, Chap. 7, § 1[1] (1979)).  The terms of Paragraph B do not resemble the broader flow down provisions more often seen and discussed in other cases.  *See, e.g., DSD Laboratories, Inc. v. United States*, 46 Fed. Cl. 467, 472 (Fed. Cl. 2000);[3] *United Tunneling Enterprises,* 35 F. Supp. 2d

---

[3]"FLOW DOWN. Some clauses of the [1996 CAAS] Prime Contract are included hereunder for particular treatment and emphasis, however, all terms and conditions of contract F44650-96-D0003 [the 1996 CAAS contract] shall apply to this subcontract agreement. Further, <u>all of the terms and conditions of the FARs, and DFARs shall be used to resolve disputes consistent with this agreement</u> and contract F44650-96-D0003." (underlining added).

at 794.[4]

The terms of Paragraph B do not purport to establish a full correlative position between the parties to the prime contract and the parties to the subcontract.  The heading of Paragraph B is "Plans and Specifications" and necessarily reveals the intent to limit what flows down to the subcontract.  The terms of Paragraph B impose obligations only on QTI as the subcontractor.  The terms specifically bind only QTI as the subcontractor to the performance that Cajun has contractually assumed towards the COE.  The operative language requires QTI in its performance of the subcontract to adhere to the same performance terms, conditions, responsibilities and duties that Cajun owes to COE.  The court finds that the parties did not intend Paragraph B to accomplish a general incorporation of all rights and responsibilities given all parties to the prime contract.  *See Torpo Services v. McCarthy Western Constructors*, 827 F. Supp.  666, 667-68 (D. Colo. 1993); *cf. Dynamic Drywall, Inc. v. Walton*

---

[4]"[T]he Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under the Prime Contract, assumes toward the Owner and the Architect.  . . . [T]he Subcontractor shall have the benefit of all rights, remedies and redress against the Contractor which the Contractor, under the Prime Contract, has against the Owner, insofar as applicable to this subcontract."  (underlining added)

*Const. Co., L.L.C.*, 2007 WL 164351, at *2 (D. Kan. 2007).

The plaintiff's motion rests on reading Paragraph B as a general flow down provision of all rights, responsibilities and remedies found in the prime contract.  As stated above, the court rejects this reading as contrary to the plain terms of the subcontract.  The plaintiff offers no alternative arguments to show how F.A.R. 52.249-10 would fall within the narrower flow down provision actually found in Paragraph B.  For that matter, the record does not openly afford any such arguments.  The subcontract does not generally incorporate federal regulations and does not specifically incorporate this federal regulation.  Instead of providing that it will be governed by federal regulations, the subcontract expressly states that the laws of Louisiana will govern the terms and provisions of the agreement.  In wanting to make this federal regulation part of the subcontract, the plaintiff seeks to create a new and limited remedy (termination for convenience) available upon proof the defendant was not justified in terminating the contract because the plaintiff's delay was excusable.  In other words, the plaintiff wants a remedy without necessarily having to prove the defendant breached an express term of  the written subcontract.  The subcontract lacks any terms suggesting the parties'

contemplated such a remedy and procedure to be available here.  Absent this, the plaintiff lacks a defensible position for asking this court to rewrite the subcontract so as to provide an additional remedy.

The plaintiff's motion on this first contention concludes with a single-sentence argument that "Cajun's actions in terminating the subcontract also breached its covenant of good faith and fair dealing, which is implied in every construction contract."  (Dk. 85, p. 8).  The plaintiff cites several authorities, none of which inform the court of Louisiana law.  The court's own research reveals that Louisiana courts have held that the covenant of good faith performance is implied in all contracts, including construction subcontracts.  *See, e.g.*, *Gibbs Constr. Co., Inc. v. Thomas*, 500 So. 2d 764, 768 (La. 1987).  The plaintiff does not identify or argue what Cajun specifically did as part of the "actions in terminating the subcontract" that were in breach of this implied covenant.   It is not the court's responsibility to fashion and present arguments on behalf of any party, let alone a summary judgment movant.  The plaintiff's motion is denied.

### The "No Damage For Delay" Clause Does Not Apply

The plaintiff's second contention for summary judgment is that

its recovery on the breach of contract claim is not subject to Article Three, Paragraph F of the subcontract which provides in pertinent part that the subcontractor is not entitled to compensation or damages caused by delay or schedule adjustments. The plaintiff argues initially that the clause is inapplicable as its claim is for wrongful termination and not just damages caused by delays. Even if the clause is to be applied here, the plaintiff alternatively argues for the court to recognize one of several possible exceptions. First, the clauses are not enforced if the delays or the causes of the delays were not contemplated at the time of contracting. Based on the work schedule in place at the time of entering the subcontract, QTI insists it could not have possibly contemplated both the delayed start and then the combined release of three or four buildings for construction within a short period of time. Second, courts permit recovery if the delay is unreasonably long, and QTI summarily asserts the delay here fits the definition of unreasonable. Third, a contractor may not benefit from a no-damages for delay clause when it actively interfered with the subcontractor's performance and caused the delay. QTI blames the delay here on Cajun's failure to provide QTI with timely access to materials (metal buildings) and to work sites (foundations).

24

The defendant Cajun points out that QTI grounds its breach of contract claim on the allegation that Cajun delayed the commencement of QTI's work.  As the pretrial order reflects under the Theories of Recovery section, the plaintiff agreed that the second essential element of its breach of contract claim was:  "Cajun caused unnecessary and unreasonable delays and otherwise interfered with QTI's ability to perform its work under the subcontract; . . . ."  (Dk. 77, p. 6).  To the extent that the plaintiff seeks to recover for any delays caused by Cajun as pleaded in the pretrial order, then Article Three, Paragraph F of the subcontract would appear applicable.

To the three exceptions argued by the plaintiff, the defendant counters that the plaintiff has not come forward with the evidence necessary to sustain summary judgment.  The court agrees that the plaintiff's motion does not establish the uncontroverted facts necessary for proving, directly or inferentially, any of the three exceptions.  In latter parts of this order, the court will discuss in greater detail the problems with the plaintiff's evidence presented in this summary judgment record.  The plaintiff's motion for summary judgment is denied.

*DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

25

Inadequate briefing and incomplete development of the facts and arguments by both sides have complicated the court's efforts. This circumstance motivates the court to take a strict approach not only in applying the procedural rules governing summary judgment but in addressing only those arguments fairly presented and supported by the facts. The court's responsibility in deciding a summary judgment motion does not extend to digging through a record without proper citations, fashioning arguments, recasting theories, or offering other authorities for the different issues.

<u>Applicable Law</u>

The defendant posits that federal law governs the plaintiff's Miller Act claim but that Louisiana law pursuant to the choice-of-law clause in the subcontract governs the plaintiff's claims arising out of their contractual relationship. The defendant concedes the plaintiff's tort claims are governed by Kansas law and believes Kansas law should also cover the plaintiff's equitable claims. The plaintiff takes the unique position that its contract claim and equitable claims are "largely governed by federal case law and the federal acquisition regulations, which are incorporated in the subcontract." (Dk. 93, p. 5). Because this work was to be done on a

26

federal military base and the contract documents incorporated by reference many federal regulations, the plaintiff attributes a "federal" character to the contractual relationship and asserts that these regulations "supercede the provisions of Cajun's standard forum and choice of law clause." *Id.* at 6. The plaintiff does not dispute the application of Kansas law to its tort claims.

As the court has found above, the terms of Paragraph B to the subcontract reveal the parties did not intend to establish a full correlative position between the parties to the prime contract and the parties to the subcontract or to incorporate all rights and responsibilities to the prime contract. Paragraph B imposes obligations only on QTI as the subcontractor. The court concludes that Paragraph B did not "federalize" the subcontract or supercede the choice-of-law clause found in the subcontract. At the same time, it is worth noting that in Miller Act suits courts often will look to federal case law absent some distinct conflict between federal and state law. *See, e.g., U.S. for Use of C.J.C., Inc. v. Western States Mechanical Contractors, Inc.,* 834 F.2d 1533, 1539 (10th Cir. 1987); *Burgess Constr. Co. v. M. Morrin & Son Co.*, 526 F.2d 108, 114 n. 2 (10th Cir. 1975), *cert. denied*, 429 U.S. 866 (1976). In sum, the court

27

will apply federal law to the Miller Act claim, Louisiana law to the breach of contract claim, and Kansas law to the remaining claims.

<u>Miller Act Claim</u>–Plaintiff's First Theory of Recovery

The defendants moves for summary judgment on this claim arguing that the plaintiff has not proved it received less than full payment for its work.  According to the defendants, the plaintiff's only evidence in proof of this element is QTI's  progress payments rejected by Cajun.  The defendants maintain QTI is unable to present other evidence of having performed work or procured materials pursuant to the subcontract for which it was not paid by Cajun. The plaintiff denies that its only evidence is the rejected progress payments but considers the defendants to have conceded liability on this claim in admitting that not all of QTI's progress payment were satisfied.

A subcontractor suing under the Miller Act and seeking to recover on the payment bond must prove in relevant part that it was not paid for work performed or supplies furnished pursuant to the subcontract. *See U.S. for Use and Benefit of Pro Controls Corp. v. Conectiv Services, Inc.*, 2003 WL 22025016, at *11 (D. Kan. Aug. 27, 2003); *U.S. for Use of Westinghouse Elec. Corp. v. Jomac Const. Co., Inc.*, 1991 WL 241867, at

28

*2 (D. Kan. 1991).  Article ten of the subcontract entitles QTI to progress payments equal to the "percentages of the value of the work done and acceptable . . . as determined by Contractor."  (Dk. 80, Ex. C).  Ruiz testified on behalf of QTI that it submitted to Cajun payment requests for work completed and that Cajun wrongfully denied the payment requests. Ruiz has averred what percentage of work was done on the four buildings at the time the subcontract was terminated.  An "appropriate measurement of damages is that percentage of the subcontract price equal to the percentage of work . . . completed, thereby ensuring both parties the benefit of the bargain."  *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 762, n.3 (10th Cir. 1997).  Drawing all reasonable inferences in favor of the plaintiff, Cajun's payments to QTI and to QTI's subcontractors total less than what is calculated from the percentage of the subcontract price on the respective buildings equal to the percentage of work completed on those buildings as averred by Ruiz.  Dupuy's averment that QTI's completed work is "less than" Ruiz's percentages creates a genuine issue of material fact. Moreover, the record shows a genuine issue of material fact concerning the propriety of Cajun's denial of QTI's payment requests.  The defendants have not carried their burden as movant for summary judgment to show it

is entitled to judgment as a matter of law on the plaintiff's Miller Act claim.

The defendant's motion for summary judgment is denied.

<u>Breach of Contract Claim</u>–Second Theory of Recovery

The pretrial order reflects that QTI believes it must prove the

following in order to recover under this theory:

1.    QTI wholly performed its duty under the Subcontract until Cajun
       wrongfully terminated it;

2.    Cajun caused unnecessary and unreasonable delays and
       otherwise interfered with QTI's ability to perform its work under
       the subcontract; and

3.    QTI is entitled to damages, including payment for labor,
       equipment, materials, subcontractor's overhead, extended
       overhead, profit and settlement costs.

(Dk. 77, pp. 6-7).  As written, the elements appear to plead two separate

claims for breach of contract:  (1) wrongful termination and (2)

unreasonable delays and interference with performance.  The court

understands that the plaintiff considers the second claimed breach to be

part of its proof of the first claimed breach.  The court's impression from the

record is that the plaintiff also seeks to recover for the second breach

whether or not it prevails in proving the first.

Cajun moves for summary judgment contending the

uncontroverted facts show that QTI cannot prove Cajun breached the

30

subcontract in causing unnecessary and unreasonable delays or otherwise

interfering with QTI's performance and that QTI cannot prove it had not

materially breached the subcontract before Cajun terminated the contract

for cause.

*Proof of Cajun's Breach*

Cajun first argues "the facts demonstrate . . . it was plaintiff who

caused delays in the performance of the work required by the Subcontract."

(Dk. 80, p. 14).  While Cajun presents evidence of QTI's submittals being

late and deficient, these facts fail to establish as a matter of law that Cajun

delayed releasing the work to QTI because of issues with QTI's submittals.

QTI offers some opinion evidence that the delays were due to Cajun's

failure to secure the timely delivery of the buildings and to complete the

foundation work.  (Dk. 87, Ruiz Dep. ¶ 8).  From the record presented, the

facts are controverted on this issue so as to prevent summary judgment.

Cajun next points to the uncontroverted fact that QTI entered

the subcontract understanding that it did not specify a commencement

date, time frame, or time limit for QTI's performance.  Ruiz even admitted

on behalf of QTI that in the subcontract QTI took the risk of uncertainty on

the commencement date.  (Dk. 96, Ex. C, Ruiz Dep. p. 56).  Based on the

31

parties' understanding of the subcontract, Cajun posits that "[i]t is impossible, then, that any delay, caused by Cajun or otherwise, could form the basis for a breach of contract claim." (Dk. 80, p. 15). QTI counters that Cajun interfered with QTI's ability to perform the subcontract by delaying the commencement of the work and then unreasonably demanding QTI to complete four buildings all within the same narrow and congested time frame.

When a contract is silent as to time of performance, a reasonable time is implied. *See, e.g., Electrodata Mfg. Corp. v. Domed Stadium Hotel, Inc.*, 362 So.2d 1122, 1124 (La. App.), *writ denied*, 365 So.2d 825 (1978); *Walker v. Don Coleman Const. Co., Inc.* 338 So.2d 1183, 1185 (La. App. 1976). Put more specifically, a general contractor's unreasonable delay in providing site access to a subcontractor may be in "breach of an implied obligation not to hinder or delay the other party's performance, in the absence of a contract clause contemplating and excusing the delay." *Burgess Const. C. v. M. Morrin & Son., Inc.*, 526 F.2d at 113-114. In short, that the subcontract is silent as to when QTI's performance would begin does not bar the plaintiff from suing the defendant for breaching an implied obligation to not delay or hinder the

32

plaintiff's performance of the subcontract.  "The delay must be unnecessary, unreasonable or due to the defendant's fault."  *Id.* at 115. Thus, the plaintiff may pursue a claim for breach of this implied obligation in the subcontract.[5]  The defendant is not entitled to summary judgment on the weight of this argument.

Cajun next points to its express right under the subcontract "to provide such additional labor, equipment and material as is reasonably necessary in order to return the prosecution of the Work to the schedule."[6] QTI does not respond to this point and does not challenge Cajun's

---

[5]The court is mindful that the subcontract does contemplate and excuse delays and provide limited remedies for the same. The defendant, however, does not argue those express terms and remedies in seeking summary judgment against this claim.

[6]The subcontract provides in Article 6, ¶ I, the following:

"**Subcontractor's Failure to Prosecute Work.**  Should subcontractor for any reason fail to promptly and diligently prosecute the Work and in the manner that will otherwise interfere with, retard, or delay Contractor in completion of the Work according to the Contractor's schedule, then and in such event, Contractor shall have the right, without waiving any other available remedies, to provide such additional labor, equipment and material as is reasonably necessary in order to return the prosecution of the Work to the Contractor's schedule and to deduct the costs thereof, on a time and materials basis, from any monies then due or thereafter to become due Subcontractor.

(Dk. 80, Ex. C, pp. 6-7).

contractual authority to assist in getting the work back on schedule.  Nor does QTI contest Cajun's presentation of facts in support of this issue.  To the extent the plaintiff is making a claim that Cajun interfered by offering such assistance pursuant to this provision of the subcontract, the defendant's summary judgment motion is granted as uncontested.

*Justified Termination*

Citing the general contract principle that a party may refuse to perform if the other party has failed to perform, Cajun argues it's eventual termination of the subcontract was justified as QTI had materially breached the subcontract.  In particular, Cajun contends QTI "failed to provide submittals in complete and exact accordance with the" required sections, "failed to provide submittals at all in some areas covered by the Subcontract," and failed "to prosecute its work under the Subcontract diligently."  (Dk. 80, p. 16).

QTI responds first with its termination for convenience remedy which the court has rejected above as unavailable.  QTI next reasons that because of Cajun's delay QTI had it's performance forced into a narrow and congested window and when QTI could not "meet the unreasonable demands of Cajun" the subcontract was terminated by mistake.  Lastly, QTI

34

denies that its difficulties with submittals caused the delayed commencement of the different buildings.

Cajun has met its summary judgment burden in proving the following.  Cajun repeatedly notified QTI that it had failed to complete and provide the submittals required by the subcontract and that it was not diligently performing the subcontract with a sufficient workforce to complete the buildings on schedule or within the dates as promised.  The plaintiff does not effectively controvert these facts as evidenced by the notices of default and termination outlining the numerous problems with the plaintiff's performance.  Instead, the plaintiff summarily blames all of these performance issues on the compressed time schedule without offering specific evidentiary proof of the same.  The plaintiff relies principally on the conclusory opinions of Ruiz and Metzger, neither of which meaningfully address all of the material deficiencies with QTI's performance laid out in Cajun's notices.  More importantly, the plaintiff offers no evidence of having submitted to Cajun written notices of delay or requests for extension pursuant to the provisions of the subcontract.  It stands as uncontroverted that prior to Cajun's notices of default QTI never furnished a written notice of unsuitable work conditions or a written notice of delay.  Having

apparently failed to avail itself of its express rights under the subcontract for extensions and delays and having no substantive proof to controvert all of the material breaches in its performance, the plaintiff's claim of breach of contract for an unjustified termination is subject to summary judgment.

<u>Equitable Claims for Relief</u>

As three alternative theories of recovery, the plaintiff asserts the equitable claims of unjust enrichment, quantum meruit, and promissory estoppel.  (Pretrial Order, Dk. 77, pp. 7-8).  Cajun contends these theories are equitable remedies limited to quasi-contractual relationships and, thus, are unavailable here due to the valid and enforceable subcontract governing the parties' relationship.  QTI counters with federal case law recognizing the remedy of quantum meruit in Miller Act litigation and repeats its termination for convenience theory already rejected above.  QTI then concedes that its "claims of promissory estoppel and misrepresentation are unnecessary to the resolution of this case."  (Dk. 93, p. 9).

Miller Act precedent in the Tenth Circuit recognizes "that a subcontractor may recover in quantum meruit from the prime contractor and surety in at least two instances."  *United States v. Western States*

36

*Mechanical Contractors*, 834 F.2d 1533, 1550 (10th Cir. 1987); *United States For Use and Benefit of D & P v. Transamerica Insurance Co.*, 881 F. Supp. 1505, 1508 (D. Kan. 1995); *United States For Use and Benefit of Joseph Stowers Painting, Inc. v. Harmon Construction Co.*, 1989 WL 32195, at *4 (D. Kan. 1989).  Those two instances are:  (1) "where there is a substantial breach of the subcontract, the subcontractor 'may forego any suit on the contract and sue for the reasonable value of his performance,'" *Western States*, 834 F.2d at 1550 (quoting *St. Paul-Mercury Indem. Co. v. United States ex rel H.C. Jones*, 238 F.2d 917, 922 (10th Cir. 1957)) (other citations omitted); or (2) "the subcontractor may recover in quantum meruit where it has performed work outside the terms fo the contract that benefits the prime contractor," *Id.* (citations omitted).  "Failure to make . . . a payment [for work done under the terms of subcontract] when due is a substantial breach of the contract entitling the subcontractor to recover in quantum meruit for the reasonable value of the work performed." *Id.* at 1551 (citation omitted).  QTI may forego its suit on the contract and pursue a claim for quantum meruit for Cajun's failure to pay sums due under the subcontract.

The court denies the defendant's motion for summary judgment

37

on the quantum meruit claim but grants as uncontested the defendant's motion for summary judgment on the plaintiff's remaining claims for equitable relief and on the plaintiff's tort claims.

## Cajun's Counterclaim

For the same reasons it is entitled to summary judgment on the plaintiff's wrongful termination of contract claim, Cajun argues the court should grant it judgment as a matter of law on its own breach of contract claim against QTI. Cajun points to the same facts in proof of QTI's failure to provide complete and proper submittals and failure to prosecute its work under the subcontract diligently. Cajun shows its complied with the subcontract in furnishing QTI with notices of default and opportunities to cure and in terminating the subcontract because QTI failed to make sufficient progress on the remaining work. Cajun's proof is uncontroverted that it paid some of the plaintiff's laborers and subcontractors and that it incurred additional costs in completing the work covered by the subcontract.

Surprisingly, the plaintiff offers no response to the defendant's motion for summary judgment on this counterclaim. By local rule, the court may consider and decide the defendant's motion as uncontested. D. Kan.

38

Rule 7.4.  Even if the court were to indulge the plaintiff and recast earlier arguments as to be applicable here, the plaintiff could not prevail for the same reasons that the court granted summary judgment on the plaintiff's unjustified termination claim.  Simply put, the plaintiff has not effectively disputed the facts showing the numerous deficiencies with its performance as evidenced by the defendant's proof including the notices of default and termination.  The conclusory opinions of Ruiz and Metzger do not offer the required specific facts necessary to create genuine issues of material fact.  Consequently, Cajun is entitled to judgment as a matter of law on its counterclaim for breach of contract against the plaintiff in the amount of $26,570.40 as pleaded in the pretrial order.

IT IS THEREFORE ORDERED that the plaintiff QTI's motion for summary judgment (Dk. 85) is denied;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Dk. 79) is denied on the following of the plaintiff's claims:  the Miller Act claims for payment under the contract and, alternatively, for quantum meruit, and the common-law breach of contract claim for unnecessary and unreasonable delays and interference with performance; the motion is granted as to the plaintiff's remaining claims for

39

relief; and the motion is granted as to the defendant Cajun's counterclaim

for breach of contract and damages in the amount of $26,570.40.

   Dated this 4th day of April, 2007, Topeka, Kansas.


     s/ Sam A. Crow
     Sam A. Crow, U.S. District Senior Judge